IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| SAMUEL SAN MIGUEL, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:20-CV-041-C |
| | § | |
| JOHN COCHRAN, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## REPORT AND RECOMMENDATION

Before the Court is Defendants Marsha McLane, Michael Searcy, Rachael Kingston, Chris Salinas, Joanne Castro, and Debra Keesee's[1] (collectively, Defendants) Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) and brief in support. ECF No. 62. For the reasons stated herein, the undersigned United States Magistrate Judge recommends that the United States District Judge **GRANT** Defendants' Motion to Dismiss.

## I.    Procedural History

Plaintiff Samuel San Miguel initially filed this action in state court alleging violations of his constitutional rights by Defendants Texas Tech University Health Sciences Center (Texas Tech), Marsha McLane, Michael Searcy, Rachael Kingston, Chris Salinas, John Cochran, Cynthia Jumper, Taylor Caldwell, Joanne Castro, Courtney Bearden, and Debra Keesee. Compl. 13–15, ECF No. 1-3.[2] Defendant John Cochran removed this case, with the consent of Defendants McLane, Searcy, Kingston, Salinas, Castro, and Keesee, from the 154th Judicial District Court of

---

[1] Defendants' Brief varies between spellings of Debra Keesee's last name, sometimes using "Keesee" and other times "Keese." *See* ECF No. 62-1, at 6. Because both San Miguel and Defendants regularly use "Keesee," the Court defers to this spelling. *See also* ECF Nos. 29, 30, 31.

[2] Page citations to San Miguel's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

Lamb County, Texas, to this Court on February 21, 2020.[3]  ECF No. 1, at 2–3.  The undersigned recommended that the United States District Judge grant motions to dismiss filed by Defendants John Cochran, Taylor Caldwell, Texas Tech, Cynthia Jumper, and Courtney Bearden, and the Court adopted the undersigned's recommendations.  ECF Nos. 29–31, 35–37, 42–43, 46–47.  San Miguel then filed an Amended Complaint on April 20, 2021 (ECF No. 60), to which Defendants filed the current Motion to Dismiss on May 4, 2021.  ECF No. 62.  San Miguel filed a belated response on July 15, 2021.  ECF No. 71.  Defendants' Motion is now ripe for review, and the district judge has referred it to the undersigned for recommendation.  ECF No. 63.

## II.    Standard of Review

### A.  Rule 12(b)(1):  Lack of Subject Matter Jurisdiction

The United States Constitution provides federal courts with original jurisdiction to hear a limited class of cases and controversies.  *See* U.S. CONST. art. III, § 2.  "Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider," and that authority extends to determining "when, and under what conditions, federal courts can hear them." *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007).  Federal courts "cannot act without authority from Congress or the Constitution."  *La. Real Est. Appraisers Bd. v. Fed. Trade Comm'n*, 917 F.3d 389, 394 (5th Cir. 2019) ("Federal courts are courts of limited jurisdiction.  They possess only that power authorized by the Constitution and statute, which is not to be expanded by judicial decree." (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

---

[3] The removal was procedurally defective because Defendant Caldwell, who had been properly served at the time of removal, did not consent to the removal.  *See* 28 U.S.C. § 1446(b)(2)(A) ("When a civil action is removed solely under section 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action.").  That defect is of no consequence, however, because San Miguel did not file a motion to remand within thirty days of the Notice of Removal.  *See* 28 U.S.C. § 1447(c) ("A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)."); *see also Honey Holdings I, Ltd. v. Alfred L. Wolff, Inc.*, 81 F. Supp. 3d 543, 554 (S.D. Tex. 2015) (citing 28 U.S.C. § 1447(c)).

The burden of establishing jurisdiction lies with the party seeking to invoke the federal forum, and a court "must presume" the suit lies outside its limited grant of jurisdiction. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). Indeed, "there is a presumption against subject matter jurisdiction that must be rebutted by the party bringing [the] action to federal court." *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996).

In determining whether jurisdiction exists, a court may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. May 1981)). A court that accepts as true a plaintiff's allegations in evaluating its jurisdiction, and does not consider evidentiary materials outside the pleading, engages in a facial review for purposes of determining subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (explaining that under facial, as opposed to factual, analysis, the court accepts as true the complaint's allegations to determine whether the plaintiff "has sufficiently alleged a basis of subject matter jurisdiction").

**B. Rule 12(b)(6): Failure to State a Claim**

To survive a Rule 12(b)(6) motion, a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering 12(b)(6) motions, courts must accept well-pleaded facts (not mere conclusory allegations) as true and view them in the light most favorable to the plaintiff. *Twombly*,

3

550 U.S. at 555 (explaining that a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 520 (5th Cir. 2016) (stating that courts accept all well-pleaded facts as true, but "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements' cannot establish facial plausibility" (quoting *Iqbal*, 556 U.S. at 678)).

A court need only determine whether the plaintiff has stated a legally cognizable claim; it does not evaluate whether the plaintiff is ultimately likely to prevail. *See United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

## III.    Background

### A. San Miguel's Claims

In his Amended Complaint, San Miguel asserts nine claims against the six remaining Defendants; however, his allegations lack clarity and consistency as to whether he asserts individual and official capacity claims against each. San Miguel sues Defendant Michael Searcy only in his individual capacity and only for monetary damages, and then generally names the five remaining parties as Defendants in both their individual and official capacities. Am. Compl. 3–4, ECF No. 60. San Miguel specifies that he seeks monetary damages against Defendant McLane in her individual capacity, and injunctive relief in her official capacity. *Id.*; *see id.* at 22–23. McLane, however, is the only remaining Defendant for whom he is this specific. Against the other Defendants, San Miguel seeks both monetary damages and injunctive relief,[4] but does not always

---

[4] Concerning his request for injunctive relief, San Miguel seeks a "PERMANENT INJUNCTION" requiring Defendants to provide San Miguel with mental health treatment and a "Clinically Therapeutic (not punitive) environment," in addition to food, clothing, and medical care. *See* Am. Compl. 21–22. Additionally, he seeks to prevent, inter alia, Defendant Keesee from "hav[ing] . . . physical access or authority to deny San Miguel his Psychiatrist prescribed medications." *Id.* at 22.

specify in which capacity. *Id.* at 4, 22.[5] Finally, San Miguel asks for declaratory relief in the form of a statement concerning what constitutional rights he possesses, as well as what type of treatment he should receive and the minimal acceptable levels that govern his conditions of confinement. *Id.* at 21.

San Miguel is a civilly committed sexually violent predator (SVP) housed at the Bill Clayton Detention Center, also known as the Texas Civil Commitment Center (TCCC), in Littlefield, Texas. *Id.* at 3, 5. He has been housed in the TCCC since September 2015. *Id.* at 5. The TCCC is operated by the Texas Civil Commitment Office (TCCO). *Id.* at 3.[6]

Per San Miguel's Complaint, Defendant McLane is the "TCCO Executive Director," and "is legally responsible for the Constitutional Standard of Professional Care, Conduct and Judgement, as applied to Clinical Treatment and Supervision, in its entire scope, of San Miguel and all those civilly committed" as SVPs. *Id.* at 6. He also alleges that "[s]he is responsible for the overall function, policy, and administration of the TCCC." *Id.*

San Miguel asserts that Defendant Searcy, as Operation Specialist of the TCCO, is "legally responsible for the overall policy and administration of the TCCO and TCCC, and the professional standard of treatment and care provided to and for the TCCC patients." *Id.* at 4, 6. San Miguel attributes to Defendant Searcy the duty of "ensuring that [San Miguel] receives the medical/psychiatric/dental care he is entitled to." *Id.* at 6.

---

[5] In summary, San Miguel appears to seek the relief specified from the identified Defendant: (1) Marsha McLane—damages in individual capacity and injunctive relief in official capacity; (2) Michael Searcy—damages in individual capacity; (3) Racheal Kingston—damages in individual capacity and both damages and injunctive relief in official capacity; (4) Chris Salinas—damages and injunctive relief in both capacities; (5) Joanne Castro—damages and injunctive relief in both capacities; (6) Debra Keesee—damages and injunctive relief in both capacities. Am. Compl. 3–4, 21–23.

[6] TCCC is currently operated by Management & Training Corporation (MTC), a private company under contract with the TCCO.

According to San Miguel, Defendant Kingston "is the Unit Administrator for TCCO." *Id.* at 4. He alleges that Kingston "is legally responsible for the overall policy and administration of the TCCO and TCCC, and the professional standard of treatment and medical/psychiatric/dental care provided to and for the TCCC patients." *Id.* at 6.

Defendant Keesee, according to San Miguel, is "a[n] RN, who was placed in the Psych [department] at the TCCC [and] is legally responsible for the accepted professional judgement standard of Psychiatric care provided to the TCCC patients as well as ensuring that plaintiff receives the psychiatric medication he has been proscribed [sic] and needs." *Id.*

San Miguel states that Defendant Castro is the "TIU [sic] Primary Care Provider over the TCCC Medical Dpt. [sic]." *Id.* at 4. He alleges that Castro is "legally responsible for the constitutional standard of medical care provided to the TCCC patients, as well as ensuring that plaintiff receives the medical/psychiatric/dental care he needs and is entitled to." *Id.* at 6.

San Miguel identifies Defendant Salinas as his "TCCO Case Manager," and contends that Salinas "is legally responsible for ensuring that San Miguel receives the medical/psychiatric/dental care he needs and is entitled to." *Id.*

San Miguel's first two claims allege that "[t]he defendants do not provide enough nourishment for Plaintiff at the TCCC, he is left with hunger pains during the day and [when he] goes to sleep . . . at night," and that the TCCC denies him access to care packages from his family because he has not taken a polygraph examination. *Id.* at 6–8. Specifically, San Miguel asserts that the "TCCC has a custom of denying the TCCC patients and San Miguel an adequate diet." *Id.* at 7. San Miguel claims that he began experiencing "extreme weight loss" in 2016, leading to a medical order for extra calories in the form of a "4oz calorie health shake with meals." *Id.* San Miguel does not provide the name or position of the person who ordered the shakes. San Miguel

states that this order remained in effect for two-and-a-half years, but that on March 1, 2019, the TCCC discontinued his shakes "without consulting him or even checking his weight." *Id.* San Miguel claims "[t]his was the result of a TCCC facility wide sweep, that discontinued every patient's calorie shake on [sic] the facility, TCCC did this to cut spending," but does not plead any facts in support of this conclusion. *Id.* He alleges that, from May 1 to August 16, 2019, his weight dropped from 162 pounds to 150 pounds and claims "that defendants are starving him, his family is worried about him, and he is in fear for his physical safety." *Id.* In connection with this weight loss, San Miguel asserts that he "has begged [D]efendants Searcy, Kingston, and Salinas, to allow him to receive a package of food from his family yet they have refused him this for over a [sic] 1 year and 8 months." *Id.* at 7–8. He then avers that "Searcy has laughed at plaintiff multiple times, when he has personally denied San Miguel's request to have a care package." *Id.* at 8. According to San Miguel, the basis for denying him care packages is that "he has not taken a polygraph exam." *Id.*

The third claim is premised on allegations that San Miguel has had a chipped a tooth since entering TCCC in September 2015, and that a dentist informed him he risks losing the tooth if it is not repaired with a filling.[7] *Id.* He asserts that Defendants McLane and Searcy have "personally denied him this dental care for over 4 years," with Searcy allegedly telling him "multiple times in the past" that the TCCC is "not gonna pay to fix it." *Id.* San Miguel further claims that "Defendants also deny San Miguel teeth cleanings or any type of dental checkups of any kind," but also states that he has visited the dentist twice since he was transferred to TCCC. *Id.* San Miguel then compares his dental care while housed at the TCCC to that provided while he was an inmate in the Texas Department of Criminal Justice (TDCJ), alleging that his treatment at the

---

[7] San Miguel does not specify when the dentist made this determination.

TCCC is "worse" than his treatment in TDCJ.  *Id.*   Finally, San Miguel states, "Defendants Kingston[,] Salinas, . . . [a]nd Castro have each denied Plaintiff this dental care for the entire time they have been employed or contracted with the TCCC."  *Id.*

With respect to his fourth claim, San Miguel alleges that "Defendants expect San Miguel to pay for his own dental care, yet he is completely deprived of his liberty, and forced to remain indigent at the TCCC as he cannot seek gainful employment."  *Id.* at 9.  San Miguel then references a grievance response, allegedly stating "Texas Tech does not provide Dental Care," but also stating that "MTC schedule[s] Self Pay appointments" and "Texas Tech Provides Emergency dental care only."  *Id.*

Claims five through nine of San Miguel's Amended Complaint relate to his psychiatric medical care and medications, which he alleges not to have received for various reasons.  *Id.* at 9–15.  Specifically, San Miguel contends that in September 2019, when Texas Tech took control of mental health care at the TCCC, TCCC's policies changed and he no longer received adequate psychiatric care.  *Id.* at 9–10.  San Miguel avers that in November 2019, Defendant Keesee "suddenly stopped providing him his antipsychotic medication Seroquel, which he had been taking for 2 [and a half] years," causing him to experience withdrawal symptoms.  *Id.* at 10.  San Miguel avers that for fifteen days, he "was left to endure the withdrawal effects that the Warning Label of the Medication warns about."  *Id.* at 14.  Thereafter, San Miguel asserts Defendant Keesee denied his Wellbutrin medication.  *Id.* at 11.  According to San Miguel, Defendant Keesee stopped his medications because blood tests showed the medications either were not present in his blood or were at very low levels, which he claims was a fabrication.  *Id.* at 10, 16.

San Miguel concedes that TCCC officials later provided him with 3mg of melatonin and 50mg of crushed Zoloft (an antidepressant) from November 26 through December 30, 2019, to

help him sleep, but he claims this was ineffective. *Id.* at 14. According to San Miguel, Defendants have deprived him of "any antipsychotic, psychotropic, any medicine at all, [and have] completely denied medical treatment for his serious need." *Id.* at 15. He attaches a Psychiatry Progress Note to his Amended Complaint, which states that TCCC's Mental Health Nurse Practitioner offered him melatonin and Zoloft for his sleeplessness, rather than the Wellbutrin he requested, "due to noncompliance" with his original treatment plan. *Id.* at 26. The nurse practitioner also noted that San Miguel "does have a history of hoarding medication," and that as of November 26, 2019, he had submitted multiple sick calls threatening to hurt himself or sue the medical staff to restart his Seroquel and Wellbutrin. *Id.*

According to San Miguel, Defendants regularly ignored his requests for medical attention in November 2019. *Id.* at 11–12. Further, San Miguel alleges Defendant Salinas, "as Plaintiff's case manager[,] was respons[i]ble for ensuring that he had the ad[e]quate medical care he was entitled to." *Id.* at 16. San Miguel asserts that this lack of medical care is due to "Defendant Marsha McLane contracting with MTC to lower the standard of care to help her manage her budget and pocket the money." *Id.* at 17. According to the Amended Complaint, San Miguel "had a mental breakdown due to lack of sleep and dealing with his diagnosed mental disorders," which resulted in a mental health professional visiting San Miguel's "solitary confinement cell" in January 2020. *Id.*

As to claim nine, San Miguel alleges that Defendant Keesee discontinued his psychiatric medication in retaliation for San Miguel writing a grievance against another nurse at TCCC. *Id.* 16–17, 21.

### B. Defendants' Motion to Dismiss and San Miguel's Response

Defendants filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6) on May 4, 2021, identifying multiple grounds for dismissing San Miguel's claims. ECF

Nos. 62, 62-1. First, under Rule 12(b)(1), Defendants argue that the official capacity claims against

them for monetary relief must be dismissed because the Eleventh Amendment provides immunity.

Defs.' Br. in Supp. 3, ECF No. 62-1 [hereinafter Defs.' Br.].  Second, under Rule 12(b)(6),

Defendants maintain that San Miguel has not established Defendants' personal involvement in his

claims sufficient to bring a cause of action under § 1983. *Id.* at 4–6. Third, Defendants assert that

San Miguel's attempt to plead Eighth Amendment claims as substantive due process violations is

improper (*id.* at 6–8), and that San Miguel does not plead facts sufficient to state an Eighth

Amendment deprivation. *Id.* at 8–9. Fourth, Defendants contend that San Miguel fails to state a

claim against them in their supervisory capacities. *Id.* at 9–11. Fifth, Defendants maintain that,

insofar as San Miguel sues them in their individual capacities, they are entitled to qualified

immunity. *Id.* at 11–12. Finally, Defendants state that, based on the foregoing grounds already

identified in their Brief, San Miguel cannot meet the required elements for seeking injunctive

relief. *Id.* at 12–13.

San Miguel filed a Response to Defendants' Motion on July 15, 2021. ECF No. 71. In his

Response, San Miguel reiterates that he has properly alleged some claims under the Fourteenth

Amendment, rather than the Eighth. Pl.'s Resp. 2–3, ECF No. 71. San Miguel further counters

Defendants' Eleventh Amendment argument, claiming that there "simply [i]s no official capacity

claim for monetary damages" in his Amended Complaint.[8] *Id.* at 5. Next, San Miguel states that

---

[8] In his Response, San Miguel states that he is "not seeking any monetary damages in the defendants [sic] official capacity and he states this clearly as to each defendant." Pl.'s Resp. 5 (emphasis omitted).  As noted above, however, San Miguel only clearly specifies his individual and official capacity claims against Defendant McLane. Am. Compl. 3–4. For the remaining Defendants, San Miguel instead refers broadly, and often inconsistently, to his capacity claims

Defendants mischaracterized his claim regarding his nutrition and health shakes by misquoting him, but he still does not specify Defendants' personal involvement in these claims. *Id.* at 6–9 (pointing only to his conclusory statement that "Defendants McLane, Searcy, Kingston, and Salinas Have and Are Depriving San Miguel Of Adequate Food in Violation of His Fourteenth Amendment" rights). San Miguel similarly takes umbrage with Defendants' characterization of his care package and dentistry claims, but in doing so merely restates the facts from his Amended Complaint. *Id.* at 10–13. San Miguel denies Defendants' assertion that his claims fail for want of personal liability, claiming instead that each of the remaining Defendants are "by statute legally responsible for Plaintiff's Treatment and Supervision," and therefore are liable through implementation of policy. *Id.* at 14 (citing Tex. Health & Safety Code § 841.007 (2015)).

Concluding, San Miguel addresses his claims against Defendant Keesee. Where Defendants allege Keesee's role as a Registered Nurse prevents her from affecting his prescriptions under state statute, San Miguel claims that Keesee nonetheless did impact his prescriptions in practice. *Id.* at 17–18. However, in quoting his own Amended Complaint, San Miguel merely reiterates that Defendant Keesee informed him his medication was being stopped, without specifically identifying facts showing she made the decision. *Id.* at 18 ("Keesee . . . told Plaintiff that his Seroquel was being stopped. She showed him a piece of paper saying that the medication was not detected in his blood at all.").

### IV.    **Discussion**

The Court recommends dismissal of San Miguel's official capacity claims for monetary damages because applicable immunities deprive the Court of subject matter jurisdiction. San Miguel's individual capacity claims against Defendants are also subject to dismissal because he

---

and requests for relief. *See, e.g., id.* at 4 ("[Defendant] Salinas is being sued individually and in his official capacities . . . ."); *cf. id.* ("[Defendant] Kingston is being sued individually for damages and in her official capacities . . . .").

fails to (1) allege personal involvement by any Defendant and (2) satisfy the requirements for an Eighth Amendment violation.  His official capacity claims for injunctive and declaratory relief, insofar as he pleads them, fail because San Miguel cannot demonstrate supervisory liability for any Defendant.

### A. San Miguel's claims for monetary damages against Defendants Kingston, Salinas, Castro, and Keesee in their official capacities fail because they are immune from such claims and the Court lacks subject matter jurisdiction to adjudicate them.

While San Miguel states that he is only suing Defendants McLane and Searcy for damages in their individual capacities, he makes no such distinction as to Defendants Kingston, Salinas, Castro, and Keesee, whom he sues in both their individual and official capacities.  Am. Compl. 4.  And, he has sued Defendants Kingston, Salinas, Castro, and Keesee for monetary damages.  *Id.* at 22.

It is well established that suits for monetary damages against state officials in their official capacities are barred both by state sovereign immunity and the Eleventh Amendment.  *See Almond v. Tarver*, 468 F. Supp. 2d 886, 892–95 (E.D. Tex. 2006) (collecting authorities and holding that claim against state official in his official capacity was barred by sovereign and Eleventh Amendment immunities).  Thus, any claim for monetary damages against Defendants Kingston, Salinas, Castro, and Keesee in their official capacities should be dismissed.  *See Little v. Tex. Att'y Gen.*, No. 3:14-CV-3089-D, 2014 WL 5039461, at *1, 3 (N.D. Tex. Oct. 9, 2014) (noting that "[w]hen Eleventh Amendment immunity applies, it deprives the court of subject matter jurisdiction," and granting defendant's motion to dismiss under Rule 12(b)(1) based on such immunity).

**B. San Miguel's first claim, as set forth in his Amended Complaint, fails because San Miguel does not plead facts showing both a constitutional violation and supervisory liability. Claims two, three, and four miss the mark because San Miguel does not allege a constitutional violation.**

San Miguel alleges in his Amended Complaint that Defendants McLane, Searcy, Kingston, Salinas, and Castro "Have [Deprived] and Are Depriving San Miguel" of his Fourteenth Amendment substantive due process rights as to claims one, two, three, four, and five, and deprived him of both his Fourteenth and Eighth Amendment rights as to claim six. Am. Compl. 19–20. He further contends that Defendant Keesee violated his Fourteenth Amendment substantive due process rights as to claims seven and eight and breached both his First and Fourteenth Amendment rights as to claim nine. *Id.* at 20–21. Broadly, San Miguel alleges that Defendants were deliberately indifferent to his serious medical needs in four ways: (1) Defendants McLane, Searcy, Kingston, and Salinas denied him medically ordered calorie supplement shakes based on financial cost; (2) Defendants McLane, Searcy, Kingston, and Salinas refused to provide him with a package of food due to his continuing refusal to take a polygraph exam; (3) Defendants McLane, Searcy, Kingston, Salinas, and Castro denied him dental care by refusing to pay for treatment; and (4) all Defendants ceased his psychiatric medications without a medical evaluation. *Id.* at 19–21.

Defendants are correct in their assertion that as a civilly committed person, San Miguel's right to reasonably adequate medical care derives from the Eighth Amendment. *See Rogers v. Caswell*, 823 F. App'x 263, 264–65 (5th Cir. 2020) (per curiam) (analyzing whether civilly committed plaintiff pleaded facts supporting claim for deliberate indifference to serious medical needs under the Eighth Amendment); *Bohannan v. Doe*, 527 F. App'x 283, 292 (5th Cir. 2013) (applying Eighth Amendment standard to SVP's claim for deliberate indifference to serious

medical needs); *see also Clark v. Rivas*, No. 5:17-CV-228-M-BQ, 2018 WL 3950429, at *5 (N.D. Tex. July 17, 2018) (same), *R. & R. adopted by* 2018 WL 3946456 (N.D. Tex. Aug. 16, 2018).[9]

Under the Eighth Amendment, institutional officials have a duty to provide adequate medical care. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). To state a constitutional violation, a plaintiff must show that the official acted with deliberate indifference toward his serious medical needs, resulting in an unnecessary and wanton infliction of pain. *Id.*; *see also Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991))). Deliberate indifference "is an extremely high standard to meet" (*Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (internal quotation marks omitted)) and requires satisfaction of both an objective and a subjective component. *Rogers*, 709 F.3d at 410. A plaintiff must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell,* 463 F.3d 339, 345–46 (5th Cir. 2006). Even where a plaintiff establishes the objective element, an Eighth Amendment violation occurs only if the official (1) knew of the substantial risk of serious harm and (2) disregarded that risk by failing to take reasonable measures to alleviate it. *Id.*; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (stating prison officials are not liable for denial of medical treatment unless they know of and disregard an excessive risk to inmate health or safety).

---

[9] In his Response, San Miguel maintains that his medical-care claims are proper under the Fourteenth Amendment, and cites *Hitt v. McLane*, 854 F. App'x 591 (5th Cir. 2021) (per curiam) in support. Pl.'s Resp. 2–3. He "has stressed in his pleadings, briefs, and motions that he is protected under the Fourteenth Amendment's due process clause[,] not the Eighth Amendment." *Id.* at 2. San Miguel cites *Hitt* for the proposition that SVP condition of confinement claims arise under the Fourteenth Amendment, and apparently seeks to have his medical care claims addressed as such. *Id.* at 3. San Miguel correctly reads *Hitt's* holding but misapplies it here—*Hitt* does not address an SVP's right to reasonably adequate medical care. Following Fifth Circuit precedent, the undersigned analyzes San Miguel's medical-care claims under the Eighth Amendment. *Rogers*, 823 F. App'x at 264–65; *Bohannan*, 527 F. App'x at 292.

An official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)) (alterations and internal quotation marks omitted). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and inmate must show the official was aware of risk and consciously ignored it).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346; *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Similarly, a plaintiff's disagreement with the medical treatment provided does not give rise to a constitutional claim (*Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)), and a provider's decision not "to follow the recommendations of another treating physician does not amount to deliberate indifference." *Gobert*, 463 F.3d at 350 n.32. In sum, to state a viable Eighth Amendment claim for deliberate indifference to serious medical needs, a plaintiff must demonstrate that staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

1. **San Miguel does not plead sufficient facts concerning his claim for the denial of calorie health shakes to survive Defendants McLane, Searcy, Kingston, and Salinas' 12(b)(6) Motion to Dismiss.**

In claim one, San Miguel states that "Defendants McLane, Searcy, Kingston, and Salinas have and are depriving San Miguel of adequate food" by "arbitrarily discontinuing or not providing him his medically ordered calorie supplement" shakes. Am. Compl. 19 (cleaned up). Specifically, San Miguel alleges that "TCCC has a custom of denying the TCCC patients and San Miguel an adequate diet." *Id.* at 7. Explaining that he received a medical order for extra calories in the form of a "calorie health shake" taken with meals, San Miguel states that on March 1, 2019, TCCC "denied and ultimately discontinued his calorie shake[s], without consulting him or even checking his weight." *Id.* San Miguel reports that when he asked why he was no longer receiving the calorie shake, the facility responded that "per our medical director you do not meet the criteria for healthy shakes," but San Miguel believes the TCCC discontinued the shakes "to cut spending." *Id.* Following the discontinuance of his calorie shakes, San Miguel claims he lost twelve pounds between May and August 2019. *Id.* San Miguel assigns responsibility to Defendants McLane, Searcy, and Kingston, who he claims are "responsible for the overall function, policy, and administration of the TCCC" and TCCO, and Defendant Salinas as his case manager. *Id.* at 6, 19.

Defendants do not directly address San Miguel's policy claim in their brief, instead only covering the issues of personal involvement and supervisory liability as to the named Defendants. Defs.' Br. 4–6, 9–11. Specifically, Defendants state that San Miguel cannot hold Defendants McLane, Searcy, Kingston, and Salinas "liable under 42 U.S.C. § 1983 for failing to ensure other non-parties did not violate San Miguel's constitutional rights," and that he "states no facts that suggest what policies Defendants personally implemented that led to his injuries." *Id.* at 10.

A plaintiff bringing a supervisory liability claim must first plead an underlying constitutional violation. *E.g.*, *Thompkins v. Belt*, 828 F.2d 298, 303–04 (5th Cir. 1987). Thus, to succeed on claim one, San Miguel must allege (1) deliberate indifference to his serious medical needs, and (2) Defendants McLane, Searcy, Kingston, and Salinas's personal involvement in the deprivation via their supervisory capacity. *See id.*

### a. Deliberate Indifference

To establish that Defendants were deliberately indifferent to San Miguel's serious medical needs when they purportedly ceased his calorie shakes, San Miguel must first prove objective exposure to a substantial risk of serious bodily harm, and that the Defendants (1) knew of the risk but (2) disregarded it. *Gobert*, 463 F.3d at 345–46; *Harris*, 198 F.3d at 159. Courts may infer substantial risk of harm where the risk is "obvious," such as when an institution disregards a doctor's orders. *Monceaux v. White*, 266 F. App'x 362, 366 (5th Cir. 2008) (per curiam) ("While deliberate indifference cannot be inferred from a prison official's mere negligence, it can be inferred from nurses who know of but disregard standing orders such as those in this case." (internal citation omitted)); *Lawson v. Dallas Cnty.*, 286 F.3d 257, 263 (5th Cir. 2002) (affirming district court's finding of deliberate indifference where "jail nurses did not follow [doctors'] instructions, despite their actual knowledge of the seriousness of [plaintiff's] condition").

Moreover, in certain instances, "[t]he denial or delay of necessary medical treatment for financial or other improper motives not based on medical reasons may constitute an Eighth Amendment violation." *Hanna v. Corr. Corp. of Am.*, 95 F. App'x 531, 532 (5th Cir. 2004) (per curiam) (holding that issue of whether defendants' delay in providing medical treatment was based on financial reasons created fact question that could not be resolved on defendants' 12(b)(6) motion); *Doughty v. LeBlanc*, No. 17-1377-SDD-EWD, 2018 WL 4496659, at *7–8 (M.D. La.

Aug. 28, 2018) (recommending that allegations of denial of necessary medical treatment for financial motives survive defendants' motion to dismiss in defendants' individual capacities), *R. & R. adopted by* 2018 WL 4494980 (M.D. La. Sept. 19, 2018). Thus, where a plaintiff alleges that a defendant's "treatment decisions were, in whole or in part, directed by financial concerns, not medical judgment . . . , the issue of deliberate indifference, and thus that of qualified immunity, must remain before the Court for further consideration." *Smith v. Williams*, No. H-16-1545, 2017 WL 991055, at *1 (S.D. Tex. Mar. 13, 2017).

San Miguel asserts that Defendants disregarded medical orders by depriving him of his calorie supplement shakes without a medical examination. Am. Compl. 7. San Miguel does not specifically allege that it was a doctor who ordered the shakes. If alleged and proven, such facts would render the objective element—substantial risk of serious bodily harm—"obvious." *Monceaux*, 266 F. App'x at 366.

Even if San Miguel's conclusory assertions in this regard are sufficient (and the undersigned finds they are not), his pleadings nevertheless fail to state a viable Eighth Amendment claim against Defendants McLane, Searcy, Kingston, and Salinas. San Miguel pleads no facts showing these Defendants either (1) personally engaged in conduct giving rise to a constitutional violation, i.e., they specifically refused and/or discontinued his calorie shakes, or (2) initiated a policy violative of the Constitution that injured San Miguel. Unfortunately for San Miguel, his pleadings fail on both counts.

### b. Supervisory Liability

It is well established that supervisory officials are not liable for the acts of their subordinates unless the official: (1) affirmatively participated in an act that caused a constitutional deprivation; or (2) implemented an unconstitutional policy that resulted in injury to the

18

plaintiff. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citing *Thompkins*, 828 F.2d at 303).[10] A plaintiff must sufficiently allege facts showing either personal involvement or implementation of an unconstitutional policy to make a supervisor responsible under § 1983, as institution supervisors "are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins*, 828 F.2d at 303. Even if a plaintiff can prove implementation of a policy, supervisory liability only exists if "the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Id.* at 304 (internal quotation marks omitted) (quoting *Grandstaff*, 767 F.2d at 169).

In his factual recitation, San Miguel alleges TCCC "denied and ultimately discontinued his calorie shake" as a result of a "TCCC facility wide sweep," without reference to specific actions by McLane, Searcy, Kingston, or Salinas. Am. Compl. 7. Unlike in *Monceaux* or *Lawson*, San Miguel does not specifically allege that one or more of these Defendants personally violated his doctor's orders, assuming a physician in fact prescribed the shakes. *See id.*; *Monceaux*, 266 F. App'x at 366; *Lawson*, 286 F.3d at 263. Instead, San Miguel names each of these Defendants merely in their capacity as supervisors, without pleading specific facts as to any one of them or citing official TCCC policy. *See* Am. Compl. 4, 6.

Because San Miguel does not plead an affirmative, participative act by Defendants McLane, Searcy, Kingston, and Salinas, he must establish that they personally implemented an unconstitutional policy that caused his injury. *Mouille*, 977 F.2d at 929. A plaintiff can prove "a

---

[10] The Fifth Circuit "has noted 'the close relationship between the elements of municipal liability and an individual supervisor's liability' and held that 'the same standards of fault and causation should govern.'" *Walker v. Upshaw*, 515 F. App'x 334, 339 n.19 (5th Cir. 2013) (quoting *Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 551 (5th Cir. 1997)). For this reason cases evaluating the policy elements for one will often cite cases construing the other. *See, e.g.*, *Thompkins*, 828 F.2d at 304 (supervisory liability) ("Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir. 1985) (municipal liability))). This Court follows a similar track and relies on authority involving both municipal and supervisory liability.

government's policy or custom" through methods other than reference to formal policy, such as showing the existence of an unconstitutional practice that is so "persistent and widespread" as to constitute a de facto policy or custom. *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690–91 (1978) ("[L]ocal governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."). Plaintiffs face a high burden when claiming a level of pervasiveness sufficient to attribute an informal policy to a government entity or supervisory official. *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984) ("Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy."); *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("Normally random acts or isolated incidents are insufficient to establish a custom or policy.").

Critically, San Miguel does not explain the basis for his claim that TCCC performed a "facility wide sweep" discontinuing "every patient's calorie shake [in] the facility." Am. Compl. 7. For example, San Miguel does not cite to a new TCCC policy that discontinued the shakes. *See id.* Rather, San Miguel appears to allege a widespread "custom," without providing supporting facts, such as specifically identifying even one other TCCC patient who was similarly denied calorie shakes without a medical evaluation. *See id.* Most importantly, San Miguel does not identify affirmative acts by Defendants McLane, Kingston, Searcy, or Salinas that resulted in such a policy or custom. *See id.* Rather, San Miguel has simply named every person with a title that he thinks *might* have some policymaking role and claims that they should be held liable. *See, e.g.*, *id.* at 6 (stating that Defendant McLane "is responsible for the overall function, policy, and administration of the TCCC," and that Defendant Searcy and Kingston are each "legally responsible for the overall policy and administration of the TCCO and TCCC"); *see also San*

*Miguel v. Cochran*, No. 5:20-CV-041-BQ, 2020 WL 5778130, at *5–6 (N.D. Tex. Sept. 11, 2020)

(recommending dismissal of San Miguel's claim against former Defendant for same reason), *R. &*

*R. adopted by* 2020 WL 5761087 (N.D. Tex. Sept. 28, 2020).

Thus, San Miguel does not plead sufficient facts regarding a policy or custom within TCCC

to survive a motion to dismiss. *Schaefer v. Whitted*, 121 F. Supp. 3d 701, 718–19 (W.D. Tex.

2015). "Without specifically identifying policies promulgated by [TCCC] policymakers, and

without providing specific examples of a persistent and widespread abuse, Plaintiff fails to provide

the [Defendants] with fair notice of the grounds for [his] claim." *Id.* ("Plaintiff's allegations are

simply a reformulation of the elements of a claim for municipal liability based on an

unconstitutional custom or practice devoid of any factual enhancement or support.").

For these reasons, the undersigned recommends dismissal of San Miguel's shake-

deprivation claim against Defendant Searcy in his individual capacity, and Defendants McLane,

Kingston, and Salinas in both their individual and official capacities.

**2. San Miguel's claim that Defendants McLane, Searcy, Kingston, and Salinas unlawfully denied him a food package because he refused to take a polygraph exam does not survive Defendants' Motion to Dismiss.**

The Court liberally construes San Miguel's pleadings as raising a similar Eighth

Amendment claim of deliberate indifference to serious medical needs where San Miguel alleges

that because he refused to take a polygraph exam, Defendants Searcy, Kingston, and Salinas denied

him access to a food package sent by his family, despite Defendants not providing "an adequate

diet themselves." Am. Compl. 7–8, 19. As discussed above, to sufficiently plead an Eighth

Amendment claim of deliberate indifference, a plaintiff must establish an institutional official

acted with deliberate indifference toward his serious medical needs, resulting in an unnecessary

and wanton infliction of pain. *Rogers*, 709 F.3d at 409; *see also Morris*, 739 F.3d at 747. San

Miguel has not met this standard and thus cannot establish Defendants were deliberately indifferent to a serious medical need when they refused him access to a single care package. In addition, to the extent San Miguel wishes to plead that the same denial violated his substantive due process rights or his right to adequate conditions of confinement, his claim similarly fails.

### a. Deliberate Indifference

San Miguel's food package claim falls short on multiple grounds in regard to a deliberate indifference medical claim. San Miguel alleges that his family has attempted to send him a care package for "over 1 year and 8 months," but that Defendants have denied giving him the package because "he has not taken a polygraph exam." Am. Compl. 7–8 (cleaned up). Unlike his claim concerning the calorie shake, San Miguel has not alleged that he was under active medical orders to receive the care package, nor does he otherwise indicate that a care package was medically necessary. *See id.* Rather, San Miguel alleges that he "specifically pleaded to be allowed a package of food" following the weight loss caused by denial of his calorie shakes, and that his family was "worried about him" due to his weight. *Id.* at 7. San Miguel does not allege that he sought or received approval for the care package, or a similar commissary purchase, from a medical professional as a form of health care—he simply alleges that Defendants Searcy, Kingston, and Salinas denied him access to the package. *See id.* at 7–8. Neither does San Miguel plead that he lost weight as a *result* of the care package denial—only that alleged weight loss was the *cause* for his request. *See, e.g.*, *id.* at 7 (describing his weight loss as occurring "from May 1, 2019–August 16, 2019" then stating he "specifically pleaded to be allowed a package of food" on August 28, 2019). Under these facts, San Miguel has not indicated what medical need was implicated by the denial of his care package, nor how it resulted in unnecessary and wanton infliction of pain, and he therefore fails to allege deliberate indifference to his serious medical

needs. *See Rogers*, 709 F.3d at 409; *see also Mead v. Palmer*, 794 F.3d 932, 936–37 (8th Cir. 2015) (determining at summary judgment that SVP's allegation that defendants denied dentures did not constitute deliberate indifference to a serious medical need where plaintiff failed to allege weight loss, pain, or general inability to eat).

### b. Due Process

San Miguel similarly fails to allege a viable conditions-of-confinement claim based on denial of the food package.  Conditions of confinement for SVPs are governed by the Due Process Clause of the Fourteenth Amendment.  *Youngberg v. Romeo*, 457 U.S. 307, 320, 324 (1982) (weighing "postcommitment interests cognizable as liberty interests under the Due Process Clause of the Fourteenth Amendment against legitimate state interests and in light of the constraints under which most state institutions necessarily operate"); *see also Hitt*, 854 F. App'x at 596 ("[T]he Supreme Court has confirmed that it is the substantive component of the Due Process Clause that is implicated in civil committees' right to adequate conditions and durations of confinement." (citing *Youngberg*, 457 U.S. at 320)).  San Miguel's conditions-of-confinement claim fails because he pleads neither a constitutional violation nor a resulting injury.

As a civilly committed person, San Miguel is entitled to "more considerate treatment and conditions of confinement" than a prison inmate.  *Youngberg*, 457 U.S. at 322.  Because San Miguel "has been civilly committed to state custody as a [sexually violent predator]," however, "his liberty interests are considerably less than those held by members of free society." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (citing *Wilkinson v. Austin*, 545 U.S. 209, 224–26 (2005) and *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)); *see Kansas v. Hendricks*, 521 U.S. 346, 368 n.4 (1997) (stating that officials "enjoy wide latitude in developing treatment regimens [for SVPs]"); *Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018) (citations omitted)

(noting that "the Constitution . . . affords a state wide latitude in crafting a civil commitment scheme" because "the state legislatures not only are equipped, but also possess the democratic mandate, to make difficult policy choices regarding the supervision and treatment of sexually violent predators"). Ultimately, "[d]ue process requires only that 'the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed.'" *Brown*, 911 F.3d at 243 (quoting *Seling v. Young*, 531 U.S. 250, 265 (2001)).

As a result, civil commitment institutions may create policies that place some restrictions on an SVP's due process rights, "so long as [the restrictions] advance the state's interest in security, order and rehabilitation." *Bohannan*, 527 F. App'x at 294. Thus, San Miguel's claim is subject to dismissal unless he can demonstrate that a restriction (1) lacked a reasonable relation to Texas's "twin goals of 'longterm supervision and treatment of sexually violent predators,'" and (2) did not bear some reasonable relation to the purpose for which he was committed. *Handsaker v. Tex. Civ. Commitment Ctr.*, No. 5:19-CV-200-BQ, 2020 WL 3052751, at *9 (N.D. Tex. May 12, 2020) (quoting *Brown*, 911 F.3d at 243), *R. & R. adopted by* 2020 WL 3052225 (N.D. Tex. June 8, 2020).

San Miguel pleads he was denied a care package because he refused to take a polygraph exam, and that in doing so, Defendants McLane, Searcy, Kingston, and Salinas violated his Fourteenth Amendment rights to substantive due process and equal protection.[11] Am. Compl. 19. Thus, liberally construed, San Miguel alleges two acts that he believes gave rise to a constitutional

---

[11] San Miguel offers no factual or legal support for his claim under the Equal Protection Clause. He does not mention, even briefly, which similarly situated persons he believes are receiving different treatment; instead, he seems to be alleging the inverse—that *differently* situated individuals (i.e., prisoners), are receiving the *same* treatment (i.e., restrictions on care packages). Am. Compl. 8, 19. "Although the Court must liberally construe a *pro se* litigant's filings in his favor, and his papers are held to less stringent standards than formal pleadings drafted by lawyers, a *pro se* litigant is not exempt . . . from compliance with the relevant rules of procedural and substantive law." *United States v. Trowbridge*, 393 F. Supp. 3d 603, 607 (S.D. Tex. 2018) (internal quotation marks and citations omitted). Because San Miguel mentions the Equal Protection Clause in name only, but does not actually plead such a claim or facts in support, the Court recommends dismissal of his claim insofar as he invokes the Equal Protection Clause.

violation within this claim: (1) requiring a polygraph exam, and (2) denying San Miguel's care package. San Miguel fails to allege a constitutional violation springing from either act.

San Miguel cannot establish that a polygraph requirement violated his due process rights. "Security measures and disciplinary rules adopted by civil commitment facilities in furtherance of the goals of supervision and treatment do not amount to a due process violation." *Welsh v. Correct Care Recovery Sols.*, 845 F. App'x 311, 323 (5th Cir. 2021) (citing *Brown*, 911 F.3d at 243–44). The Fifth Circuit has identified two instances in which an institution wrongfully denied a committed person's constitutional rights stemming from refusal to take a polygraph exam: first, where a polygraph exam would have forced a criminal suspect to violate his Fifth Amendment privilege against self-incrimination (*Bohannan*, 527 F. App'x at 295–96); and second, where an SVP faced a "complete ban" on his First Amendment right of association for refusing a polygraph exam (*Day v. Seiler*, 560 F. App'x 316, 320 (5th Cir. 2014)). San Miguel has not legally or factually raised either of these claims. He does not specifically challenge the validity of the polygraph requirement or its application to him, nor does he contend that Defendants placed a "complete ban" on, for example, his right to receive mail—he only alleges deprivation of a care package. Civil commitment centers may invoke policies to uphold the "twin pillars" of SVP supervision and treatment. *Welsh*, 845 F. App'x at 323. Because San Miguel's alleged "deprivations flow from the rules and security measures implemented by the Texas Civil Commitment Center in service of the goals of supervision and treatment, he has not raised a viable conditions of commitment claim," his claim related to a polygraph requirement should be dismissed. *Id.*

Denying San Miguel's care package likewise fails to meet the standard for a conditions-of-confinement claim. The denial of certain privileges—such as receiving care packages or

purchasing additional food from a commissary—amounts to *de minimis* restrictions, of which "the

Constitution is not concerned." *See Senty-Haugen*, 462 F.3d at 886 n.7 (quoting *Bell*, 441 U.S. at

539 n.20) (explaining that SVP's contention that placement in isolation deprived him of access to

the canteen, outside vendors, and computer privileges amounted to *de minimis* restrictions of his

liberty). Under San Miguel's facts—that Defendants denied him a single care package because he

refused to comply with the facility's policies—San Miguel cannot establish more than a *de minimis*

restriction of his due process right to adequate conditions of confinement. *See* Am. Compl. 7–8;

*Judah v. Ovsak*, No. 21-CV-618 (ECT/LIB), 2021 WL 3146469, at *8 (D. Minn. July 26, 2021)

(collecting cases) (granting motion to dismiss plaintiff's claim that commitment center's policy

denying him certain property constituted a "punitive" condition of confinement).

For these reasons, the undersigned recommends dismissal of San Miguel's second claim

against Defendant Searcy in his individual capacity, and Defendants McLane, Kingston, and

Salinas in their individual and official capacities.

### 3. San Miguel's third and fourth claims—that Defendants McLane, Searcy, Kingston, Salinas, and Castro denied him dental treatment by refusing to pay for it—should also be dismissed.

Claims three and four of San Miguel's Amended Complaint relate to an alleged deprivation

of dental care. Am. Compl. 19–20. Specifically, San Miguel alleges that Defendant McLane, as

the individual "in charge of contracting treatment and care providers," and Defendant Searcy have

denied him dental care for a chipped right front tooth for four years.[12] *Id.* at 8. He alleges that a

---

[12] In his list of claims, San Miguel names Defendants McLane, Searcy, Kingston, Salinas, and Castro as Defendants to his third and fourth claims. Am. Compl. 19. However, in his recitation of facts, San Miguel only mentions Defendants McLane and Searcy (*id.* at 8), which the undersigned analyzes herein. "Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). Vague and non-specific allegations of wrongdoing are insufficient to support a § 1983 claim. *See Sias v. Louisiana*, 146 F. App'x 719, 720 (5th Cir. 2005) (holding that vague and conclusory allegations provide an insufficient basis for § 1983 claims). Because San Miguel does not attribute any acts to the remaining Defendants regarding his dental claims, the undersigned recommends the district judge dismiss claims three and four as to Defendants Kingston, Salinas, and Castro for failure to allege personal involvement.

dentist has "assessed that San Miguel needs to have his tooth filled, and that permanent damage will result in not having it filled and he will eventually lose it," but that "TCCO/TCCC have refused to pay for his dental care." *Id.* San Miguel alleges that "Defendants expect San Miguel to pay for his own dental care, yet he is completely deprived of his liberty and forced to remain indigent at the TCCC as he cannot seek gainful employment." *Id.* at 9. San Miguel then references a grievance response stating that "Texas Tech does not provide Dental Care. Submit a Communication to Captain Pierce, stating where and what you need specifically done. MTC will schedule Self Pay appointments. Texas Tech provides Emergency dental care only." *Id.* Under these facts, the Court liberally construes San Miguel as bringing two claims: (1) deliberate indifference to his serious medical needs where Defendants failed to fill his tooth; and (2) a due process violation where Defendants refused to pay for medical care despite San Miguel's alleged indigency. The undersigned addresses each of these possible constructions in turn. Under either construction, however, San Miguel's claim is barred because it falls outside of the applicable statute of limitations.

### a. Statute of Limitations

Generally, a plaintiff's § 1983 claim is subject to the statute of limitations prescribed for tort claims in the state where the district court sits. *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). Because San Miguel has filed suit in Texas, he has two years from the date he learns of facts giving rise to his § 1983 claim to pursue that claim in federal court. *Id.*; *Meyer v. Coffey*, 231 F. Supp. 3d 137, 145–46 (N.D. Tex. 2017); *see* Tex. Civ. Prac. & Rem. Code § 16.003. "Accrual of a § 1983 claim is governed by federal law . . . [and the limitations] period begins to run 'the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.'" *Piotrowski*, 237 F.3d at 576 (citation

omitted). The party claiming injury need not know, however, that "he has a legal cause of action; [he] need know only the facts that would ultimately support a claim." *Id.*

San Miguel's claim of denied care accrued more than two years ago, and therefore falls outside the statute of limitations for § 1983 claims. San Miguel states that his "tooth has been chipped since he entered the facility in September 2015" and specifically alleges that Defendants have "personally denied him this dental care for over 4 years" by refusing to have TCCC pay for it. Am. Compl. 8. Thus, San Miguel learned of facts that could "ultimately support a claim" of deliberate indifference regarding his chipped tooth well over two years prior to the date he filed his suit. *Piotrowski*, 237 F.3d at 576. The fact that San Miguel later learned from a dentist that he may in the future experience more severe tooth decay does not save San Miguel's claim from preclusion. Am. Compl. 8; *see Ward v. Choate*, No. 6:17-CV-105-JDK-KNM, 2020 WL 6937734, at *2 (E.D. Tex. Nov. 24, 2020). In *Ward*, the plaintiff "notified jail personnel that he had a tumor in his neck and that he was scheduled to see a doctor on the day he was arrested and incarcerated," but "[n]o medical intervention was sought by jail personnel at the time of booking." *Id.* at *1. Approximately two years later, and having received no treatment during the intervening period, medical personnel diagnosed the tumor as cancer and prescribed treatment that eventually forced the plaintiff to choose between (1) not being able to eat/swallow or (2) having surgery that would alleviate that difficulty but cause him to lose the ability to speak and smell. *Id.* at *2. A year after learning of this conundrum, plaintiff filed a § 1983 suit seeking damages based on defendants' alleged deliberate indifference. *Id.* at *1. Dismissing plaintiff's action as barred by the statute of limitations, the court found his claim untimely because "[p]laintiff was aware of his injury—even if he did not understand the full extent of those injuries—well before his" visit learning of the surgery. *Id.* at *2. Specifically, plaintiff "knew he had a tumor that was causing medical problems

before he was booked" into the jail, and was "aware of Defendants' inaction as to his medical needs from his booking . . . until he was finally diagnosed with cancer" two years later. *Id.* at *3.

Here, San Miguel knew of his chipped tooth at the time he entered the TCCC in 2015. Am. Compl. 8. Correspondingly, he knew at approximately the same time, i.e., going back four years,[13] that Defendants refused to have TCCC pay for repairing the tooth. *Id.* San Miguel does not allege a "new injury" occurring within the statute of limitations. *Ward*, 2020 WL 6937734, at *3. In fact, San Miguel does not allege any actual injury occurring due to the deprivation. *See* Am. Compl. 8. Even liberally construing San Miguel's pleadings, his dental care claims fall outside the statute of limitations and are therefore barred.

### b. Deliberate Indifference

Even if San Miguel has timely pursued his claims, he does not allege a constitutional violation. San Miguel contends that Defendants McLane, Searcy, Kingston, Salinas, and Castro "den[ied] [San Miguel] dental care, and refus[ed] to fix his front tooth though the dentist, in his professional judgement assessed that he needs it fixed," thereby violating San Miguel's right to adequate medical care. *Id.* at 19. In his recitation of facts, however, San Miguel does not allege that Defendants have totally denied him care; rather, San Miguel claims he must pay for treatment himself unless it is an emergency. *Id.* at 8 ("Defendant Searcy has told San Miguel personally multiple ti[m]es in the past, 'well I'll tell you right now we're not gonna pay to fix it' in response to [San Miguel] complaining about his tooth.'" (cleaned up)). Specifically, San Miguel references a grievance response stating that "Texas Tech does not provide Dental Care. Submit a Communication to Captain Pierce, stating where and what you need specifically done. MTC will schedule Self Pay appointments. Texas Tech provides Emergency dental care only." *Id.* at 9.

---

[13] Because San Miguel filed this action in January 2020, the four-year period alleged would go back to at least 2016, easily placing the accrual of his alleged injury beyond the two-year limitations period.

A civil commitment center's imposition of fees, standing alone, does not constitute deliberate indifference to serious medical needs. "The deliberate indifference standard . . . does not guarantee [institutionalized persons] the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-[institutionalized persons] in our society." *Ward v. Fisher*, 616 F. App'x 680, 684 (5th Cir. 2015) (per curiam) (quoting *Morris*, 739 F.3d at 748); *see Handsaker*, 2020 WL 3052751, at *6 (applying *Ward* to a civilly committed plaintiff). This is because institutions "have a legitimate interest in defraying the costs incurred in housing and caring for" civilly committed persons. *Ward v. Gloor*, No. V–14–0036, 2014 WL 2949454, at *2 (S.D. Tex. June 30, 2014); *see also Sanders v. Hayden*, 544 F.3d 812, 814 (7th Cir. 2008) (noting that when a "secure treatment facility" requires civilly committed persons to work, "it is to offset some of the cost of keeping them"). Requiring San Miguel to pay for a portion, or all, of the expense of his health care is an obligation that he "would be required to meet in the outside world." *Reynolds v. Wagner*, 128 F.3d 166, 174, 178 (3d Cir. 1997) (citing cases for support) (holding inmates did not establish a valid Eighth or Fourteenth Amendment claim where medical fee was "modest" in nature and inmates did not demonstrate they needed "the funds in their prison accounts for essential expenses"); *see also Morris*, 739 F.3d at 746–47 (upholding a TDCJ regulation requiring inmates to pay a $100 annual medical care fee). Therefore, the fact that TCCC allegedly assessed fees for dental treatment, standing alone, does not amount to a constitutional violation.[14]

---

[14] San Miguel cites *Carlucci v. Chapa*, 884 F.3d 534 (5th Cir. 2018) for the proposition that "not providing a prison inmate the medical procedure the dentist assessed he needs states an Eighth Amendment Claim." Pl.'s Resp. 13. San Miguel misreads the case. In *Carlucci*, the prisoner-plaintiff experienced continuous cracking and breaking of multiple teeth, the effects of which continued to compound without significant oral surgery. 884 F.3d at 539. As a result of the ongoing fracturing, the plaintiff suffered severe physical pain, which the defendants could have prevented through a dentist's recommended restorative treatment. *Id.* The Fifth Circuit did not rule on the merits of the plaintiff's claim—that is, they did not hold that defendants were, in fact, deliberately indifferent to the plaintiff's serious medical needs—but rather remanded the case for further development under the Eighth Amendment. *Id.* at 540. *Carlucci* is distinguishable from San Miguel's claims in several ways. First, San Miguel claims only a single chipped tooth,

### c. Indigency

San Miguel alleges that "Defendants expect San Miguel to pay for his own dental care, yet he is completely deprived of his liberty and forced to remain indigent at the TCCC as he cannot seek gainful employment." Am. Compl. 9. The requirement to pay for care while indigent, according to San Miguel, "violate[s] [San Miguel's] substantive due process right to be free from governmental oppression and cruel and unusual punishment under the Fourteenth Amendment Due Process Clause." *Id.* at 20 (cleaned up).

Defendants argue that San Miguel has not set forth any specific allegations of wrongdoing by Defendants McLane, Searcy, Kingston, Salinas, or Castro, instead alleging "nothing more than bare assertions of responsibility based on the positions Defendants hold with TCCO, not anything they purportedly did." Defs.' Br. 5–6. Similar to his calorie shake claims, San Miguel does not allege a particular policy or other affirmative act instituted by Defendants that led to his alleged injury. *See* Am. Compl. 9. Instead, San Miguel broadly claims that "TCCO misappropriates their funds, and pockets the money that is supposed to provide for his [dental] care," without providing facts to support his allegation or stating that one of the Defendants is the individual supposedly pocketing the money. *Id.* Because San Miguel does not allege personal involvement by any Defendant in allegedly misappropriating funds or instituting a policy that precludes him from receiving dental care, San Miguel cannot demonstrate that Defendants McLane, Searcy, Kingston,

---

seeking a cap or a filling to repair it. Am. Compl. 8. San Miguel does not claim ongoing pain and suffering due to the chipped tooth, though he does allege that "the Dentist has checked his tooth and specifically[] assessed . . . that permanent damage will result in not having it filled and he will eventually lose it." *Id.* San Miguel claims this tooth has been chipped since he entered the facility six years ago, and does not allege that such harm has actually resulted, only that he fears pain will eventually result from his chipped tooth. *Id.*; *see McQueen v. Karr*, No. 02-10553, 2002 WL 31688891, at *1–2 (5th Cir. Oct. 29, 2002) (holding that plaintiff's claim of delayed dental treatment failed "because he ha[d] not alleged any resulting harm," and any contention of pain was "the result of his own actions").

Salinas, or Castro are liable for his alleged denial of care based on inability to pay. *Mouille*, 977 F.2d at 929; *Thompkins*, 828 F.2d at 303.

For these reasons, as to his dentistry claims, San Miguel has not pleaded facts sufficient to allege either deliberate indifference to his serious medical needs or a due process violation. Consequently, claims three and four of San Miguel's Amended Complaint should be dismissed for failure to state a claim against Defendant Searcy in his individual capacity and Defendant McLane in her individual and official capacities.

## C. San Miguel's fifth, sixth, seventh, eighth, and ninth claims against Defendants McLane, Searcy, Kingston, Salinas, Castro, and Keesee for discontinuing his psychiatric medication fail to allege either a constitutional violation or an actionable unlawful policy or custom.

San Miguel appears to allege four Eighth Amendment claims of deliberate indifference to his serious medical needs stemming from the purported discontinuance of his psychiatric medications. Am. Compl. 20–21. Although the claims are similar, San Miguel asserts that Defendant Keesee[15] was deliberately indifferent when she: denied him psychiatric care by not treating his psychological disorders with medication (claim five); denied medications prescribed by another provider (claim six); ignored complaints during his medication withdrawal (claim seven); and denied him care because he broke the institution's rules (claim eight). *Id.* Stated alternatively, claims five, six, and eight all relate to the decision to stop San Miguel's medication, and claim seven concerns the alleged denial of care when he experienced withdrawal symptoms from stopping his medication. *See id.*

---

[15] San Miguel names only Defendant Keesee in his recitation of facts, and appears to identify the remaining Defendants as supervisors in his policy claim. Am. Compl. 10–15, 20–21.

1. **San Miguel fails to allege that Defendant Keesee showed a wanton disregard for San Miguel's serious medical needs by discontinuing his psychiatric medications.**

In claims five, six, and eight, San Miguel does not plead facts demonstrating that Defendant Keesee engaged in conduct evincing a wanton disregard for his serious medical needs.

To survive a motion to dismiss on his psychiatric care claims against Defendant Keesee, San Miguel must plead personal involvement by Defendant Keesee in each. *Thompson*, 709 F.2d at 382. Vague and non-specific allegations of wrongdoing are insufficient. *See Sias*, 146 F. App'x at 720; *Richards v. Johnson*, 115 F. App'x 677, 678 (5th Cir. 2004) (per curiam) (same); *Lloyd v. Jones*, No. 9:18-CV-211, 2019 WL 4786874, at *6 (E.D. Tex. Sept. 10, 2019) ("The Court does not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" (quoting *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010))), *R. & R. adopted by* 2019 WL 4747850 (E.D. Tex. Sept. 27, 2019). In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). And while courts hold pro se plaintiffs to a more lenient standard than lawyers in analyzing their complaints, they must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

As to claims five and six, San Miguel appears to allege that Defendant Keesee was deliberately indifferent to his serious medical needs when she informed him that he would no longer receive his psychiatric medications due to his blood test results. Am. Compl. 10–13, 20–21. San Miguel admits that a blood test showed the medications either were not present in his blood or were at very low levels (*id.* at 10–13), yet he claims that this was either a lie (*id.* at 10) or the result of his metabolism (*id.* at 13). San Miguel further acknowledges that when he met with

another provider (previously dismissed Defendant Bearden) following the stoppage of both medications, that provider confirmed that because of the blood work, she did not believe he was taking his Wellbutrin. *Id.* San Miguel does not contend that Defendant Keesee made the decision to cease his medications, nor that she performed the medical reasoning behind the decision; he attributes these actions to a separate provider and merely alleges that Defendant Keesee informed him of the decision.[16] *See id.* at 11–14. Without claiming that Defendant Keesee committed the purported deliberately indifferent conduct, San Miguel fails to allege the personal involvement necessary to bring an Eighth Amendment claim as to claims five and six. *Thompson*, 709 F.2d at 382.

As to claim eight, San Miguel alleges that Defendant Keesee "den[ied] him medical care because he has broken the rules of the facility, and not attended group in the past." Am. Compl. 21. However, in his statement of facts, San Miguel similarly fails to allege personal involvement by Defendant Keesee. San Miguel acknowledges that it was again a different provider, not Defendant Keesee, who informed him that she was ceasing his medication in part because he had "a long history of not going to group, and breaking the rules . . . ." *Id.* at 14. San Miguel does not assert that Defendant Keesee made the decision to cease his medication due to his failure to attend group therapy. *See id.*

Even if San Miguel could ascribe this decision to Defendant Keesee, he has not established that such a decision would violate the Constitution. "[I]n the context of medications withdrawn

---

[16] Even if San Miguel had alleged Defendant Keesee's participation in these medical decisions, the Court previously ruled that San Miguel failed to establish a constitutional violation regarding Defendant Bearden's decision to cease his psychiatric medication. *San Miguel v. Cochran*, No. 5:20-CV-041-BQ, 2020 WL 7700633, at *8–9 (N.D. Tex. Nov. 25, 2020) ("While San Miguel disagrees with the decision to discontinue his then current medications and prescribe new ones, and may have preferred that Defendant Bearden or Keesee administer a second blood test or provide his choice of medication, such decisions rest within Defendants' sound medical judgment. (internal citations omitted)), *R. & R. adopted by* 2020 WL 7698760 (N.D. Tex. Dec. 28, 2020).

or withheld, the Fifth Circuit has repeatedly stated that '[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances.'" *Gray v. Brazoria Cnty.*, No. 3:16-CV-109, 2017 WL 713797, at *4 (S.D. Tex. Feb. 23, 2017) (quoting *Rogers*, 709 F.3d at 409); *see also Carlisle v. Dunn*, No. 6:13-CV-005-C, 2015 WL 1239622, at *6–7 (N.D. Tex. Mar. 17, 2015) (affirming grant of summary judgment where doctor discontinued medication after inmate was caught hoarding medication and noting that the "choice in withdrawing the seizure medication was a sound medical decision"). Medical professionals are entitled to consider an inmate-patient's compliance when making medical decisions. *Smith v. Tom Green Cnty. Jail*, No. 6:17-CV-0055-BL, 2018 WL 3873665, at *10 (N.D. Tex. Aug. 15, 2018) ("In general, prison officials may appropriately consider whether an inmate is . . . non-compliant with prescribed medication . . . or otherwise engages in conduct which indicates that the inmate himself does not view a medical condition as serious or as requiring additional or different treatment.").

While San Miguel disagrees with the decision to discontinue his then-current medications and prescribe new ones, and may have preferred that Defendant Keesee administer a second blood test (Am. Compl. 11) or otherwise provide his choice of medication (*id.* at 14), such decisions rest within Defendants' sound medical judgment. *See, e.g.*, *Domino*, 239 F.3d at 756 (stating that the decision of whether to provide additional medical treatment is an example of pure medical judgment; the exercise of such judgment does not constitute deliberate indifference). At best, San Miguel's allegations *might* give rise to a state law claim for negligence or malpractice but would again fall short of stating a viable constitutional claim under § 1983. *See Gobert*, 463 F.3d at 346. Without an underlying constitutional violation, Defendant Keesee is entitled to qualified immunity in her individual capacity and San Miguel cannot state a claim against her in her official capacity.

*See Blakely v. Andrade*, 360 F. Supp. 3d 453, 479 (N.D. Tex. 2019) (explaining that plaintiff must plead a constitutional violation to overcome qualified immunity); *McInnis v. Broadus*, No. 1:08cv680–JMR, 2010 WL 324034, at \*4–5 (S.D. Tex. Jan. 20, 2010) ("[T]o the extent Plaintiff brings this action against Defendants . . . in their official capacities, he must establish a constitutional violation, and in addition must satisfy the three requirements necessary to impose municipal liability . . . .").

Accordingly, the undersigned recommends dismissal with respect to Defendant Keesee in her individual and official capacities as to claims five, six, and eight because San Miguel fails to allege her personal involvement (*Thompson*, 709 F.2d at 382), and alternatively as to claim eight because San Miguel fails to allege a constitutional violation. *Smith*, 2018 WL 3873665, at \*10.

### 2. San Miguel fails to allege that Defendants McLane, Searcy, Kingston, Salinas, Castro, and Keesee instituted a policy or custom of denying psychiatric care based on non-medical factors.

In claim five, San Miguel contends that Defendants McLane, Searcy, Kingston, Salinas, Castro, and Keesee instituted a policy of denying him psychiatric medical care, reducing TCCC's standards of treatment, and allowing non-treatment of his psychological disorders. Am. Compl. 20.

San Miguel contends that when Texas Tech began administering TCCC's psychiatric department in September 2019, "they immediately began to deprive TCCC patients of their medications." *Id.* at 9. He alleges this is because "the Defendants simply lowered the standard of psychiatric care, to cut spending and to conform to the formulary [Texas Tech] provides in TDC[J] Prisons . . . ." *Id.* According to San Miguel, Defendants McLane, Searcy, and Kingston—whom San Miguel names as policymakers for TCCC and TCCO—through "their instituted policy and custom of cutting spending by discontinuing patients' medications and . . . contracting for a lower

standard of medical care for TCCC patients," deprived San Miguel of his previously prescribed psychiatric medications. *Id.* at 6, 10.[17]

San Miguel appears to allege an informal policy or custom through two theories: (1) that Defendants McLane, Searcy, and Kingston created a de facto policy or custom of denying TCCC residents psychiatric care for non-medical financial reasons; and (2) that Defendant Keesee decided to stop his medication in violation of his constitutional rights, and Defendants McLane, Searcy, and Kingston ratified that decision as final policymakers. *Id.* San Miguel pleads no facts to support either of these theories.

San Miguel provides no factual basis for his conclusory assertion that Defendants "McLane, Searcy, and the Defendants as a whole apparently believed they could just stop providing proper adequate medical care," resulting in discontinuance of "a multitude of TCCC Patients['] medications." *Id.* at 10. While he claims that Defendants instituted a policy that has denied him and other patients medical care and medication because they "do not want to pay for it," he alleges no facts supporting these allegations and, as to his specific deprivation, contradictorily asserts that Defendant Keesee informed him the stoppage was due to a blood test.[18] *Id.* San Miguel's disagreement with his medical staff's treatment decisions does not give rise to a constitutional claim. *Norton*, 122 F.3d at 292.

---

[17] San Miguel does not assign TCCC policymaking authority to either Defendant Salinas or Castro, instead alleging they are "legally responsible" for San Miguel's health care. Am. Compl. 6.

[18] San Miguel also appends a progress note, in which another provider noted she changed his medications because, inter alia, San Miguel "does have a history of hoarding medication," and that she discussed alternate treatment options for his sleeplessness. Am. Compl. 26. At that visit, San Miguel expressly denied psychosis, seeking treatment only for sleeplessness and depression. *Id.* The provider explained that continuing San Miguel's requested treatment options, including Wellbutrin, was not "an option due to noncompliance," after which San Miguel agreed to use melatonin and "Zoloft crushed and floated" for his sleeplessness and depression. *Id.* A medical provider "is entitled— obliged, even—to change a patient's prescription in response to suspected misuse, addiction, or abuse. Doing so is not deliberate indifference." *Brauner v. Coody*, 793 F.3d 493, 499 (5th Cir. 2015).

Under these facts, San Miguel does not establish that staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs," and therefore fails to plead facts sufficient to raise an Eighth Amendment claim. *Johnson*, 759 F.2d at 1238. Defendants did provide him psychiatric treatment, including observation of his complaints of sleeplessness, it merely was not the medical treatment of San Miguel's choice. Without an underlying constitutional violation, San Miguel fails to plead sufficient facts demonstrating that Defendants instituted a de facto policy or custom of "persistent and widespread" Eighth Amendment violations regarding psychiatric care. *Monell*, 436 U.S. at 690–91.

San Miguel's second theory, that Defendants knew of and ratified Defendant Keesee's unconstitutional behavior, fails for a similar reason. As discussed previously, San Miguel has not established that Defendant Keesee displayed a wanton regard to his serious medical needs. Thus, San Miguel cannot meet the required elements of the "final policymaker" theory of liability: "a policy maker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 865 (5th Cir. 2012) (internal quotation marks and citation omitted). Even if he could satisfy these elements, San Miguel does not contend that Defendants McLane, Searcy, and Kingston, his named policymakers, ratified Keesee's allegedly unconstitutional decision—a higher burden than merely pleading they were aware of the action. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127 (2d Cir. 2004); *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). That is, even if Defendant Keesee violated the constitution by stopping his psychiatric medication, and Defendants McLane, Searcy, and Kingston approved of her decision to stop his medication, San Miguel would still need to plead that they were aware of

Defendant Keesee's unconstitutional motives or practices behind the decision. *Praprotnik*, 485 U.S. at 130. Because San Miguel does not assign knowledge of Defendant Keesee's actions to any of the other named Defendants, San Miguel's policy claim fails on the "final policymaker" theory as well.

For these reasons, the undersigned recommends the District Judge dismiss claim five of San Miguel's Amended Complaint as to Defendants McLane, Searcy, Kingston, Castro, and Keesee in their individual and official capacities.

### 3. San Miguel states no viable constitutional claim for deliberate indifference regarding Defendant Keesee's alleged failure to treat his withdrawal symptoms.

In claim seven of his Amended Complaint, San Miguel alleges that Defendant Keesee was deliberately indifferent to his serious medical needs when she "ignor[ed] his complaints and requests for help while he suffered injury, physically, emotionally, and mentally" after she informed him that the facility discontinued his medications. Am. Compl. 20. San Miguel alleges that he experienced severe withdrawal symptoms, including sickness, headaches, sleeplessness, emotional distress, shaking, vomiting, sweating, and physical pain, and that between November 11 through November 26, "he wrote multiple TCCC grievances, and pleaded with multiple security staff, who called the medical dept., who did nothing." *Id.* at 12–13.

Accepting San Miguel's allegations as true and viewing them in the light most favorable to San Miguel, as required at this stage of the proceedings, his described withdrawal symptoms could qualify as a serious medical need. *See Grant v. Fortner*, 487 F. App'x 169, 170 (per curiam) (5th Cir. 2012) ("The failure to treat drug withdrawal symptoms may state a constitutional claim."); *Thompson*, 245 F.3d at 457 (observing that alcohol withdrawal's delirium tremens is a serious medical need); *Carrillo v. Buendia*, No. 2:20-CV-28, 2020 WL 4584380, at *16–17 (S.D. Tex. Aug. 10, 2020) (prisoner's "serious physical withdrawal as well as psychological harm,"

where "[h]e was inconsolable, crying, anxious, paranoid, and fearful of bodily harm at the hands

of other inmates and the guards who held him . . . supports a claim for failure to provide medical

care"); *Quatroy v. Jefferson Par. Sheriff's Off.*, Nos. 04-451, 04-1425, 2009 WL 1380196, at *9

(E.D. La. May 14, 2009) (collecting cases).

Having concluded, for purposes of the present motion, that San Miguel has pleaded an

objectively substantial risk of harm, the Court must then examine whether San Miguel sufficiently

pleads facts showing that Defendant Keesee subjectively knew of the risk and consciously

disregarded it. *See Harris*, 198 F.3d at 159. To constitute deliberate indifference, an official must

have refused to treat the plaintiff, ignored his complaints, intentionally mistreated him, or engaged

in other similar conduct. *See Johnson*, 759 F.2d at 1238. Importantly, San Miguel does not plead

facts suggesting that Defendant Keesee *directly* denied help (*see, e.g.*, Am. Compl. 11 (asking

TTU nurse for help), 11 (asking RN Joe Brown for help), 12–13 (requesting help from guards), 12

(asking unspecified staff for help)), but instead asserts that he submitted several grievances over a

two-week period, implicitly suggesting that he notified Defendant Keesee of his withdrawal

symptoms. *Id.* at 11–12, 17.

In support, San Miguel attaches to his Amended Complaint several grievance forms and

sick call requests from the relevant period. *Id.* at 22–39. Only four of the forms bear Defendant

Keesee's signature or identification stamp (*id.* at 29, 34, 36, 37), and only two of those reference

specific medical symptoms, i.e., his inability to sleep. *Id.* at 29, 37. In other words, of the forms

that San Miguel allegedly provided to Defendant Keesee concerning his medical needs, San

Miguel merely complained of sleeplessness, which does not qualify as a serious medical need.[19]

---

[19] Even if San Miguel's sleeplessness constituted a serious medical need, he does not plead facts suggesting that Defendant Keesee knew of a specific harm and *actually drew the inference*. Citing only four forms received by Defendant Keesee, San Miguel does not allege, nor do the grievances themselves suggest, that she consciously disregarded a serious risk of harm. The grievance process, standing alone, is insufficient to place Defendant Keesee

*See Dorton v. Freeman*, No. 2:14-cv-140-KS-MTP, 2016 WL 783402, at *6 (S.D. Miss. Feb. 5, 2016) (granting motion for summary judgment as to claim that defendants did not treat sleeplessness where detainee "failed to identify any serious medical condition he faced or any resulting substantial harm"), *R. & R. adopted by* 2016 WL 815007 (S.D. Miss. Feb. 29, 2016).

As to the grievance received on January 2, 2020, in which San Miguel states that without his psychiatric medication he could "not sleep and [was] suffering emotional distress," a nurse noted on the form that the sick call request resulted in a January 8, 2020, medical visit with Defendant Keesee. Am. Compl. 28. In his description of the medical visit, San Miguel only reports that he spoke with Defendant Keesee about his retaliation allegation against another provider, and he does not allege that he informed her of any withdrawal symptoms. *Id.* at 16–17. Accordingly, even considering these grievances, San Miguel's Amended Complaint does not indicate that Defendant Keesee was personally aware of San Miguel's risk of harm or that she consciously disregarded that risk—this deficiency is fatal to his claim. *See Harris*, 198 F.3d at 159; *see also Banks v. Thomas*, No. 11-301-GPM, 2012 WL 384527, at *3 (S.D. Ill. Feb. 6, 2012) (concluding that plaintiff's allegations "amount[ed] to [nothing] more than negligence, not . . . deliberate indifference," where doctor "abruptly discontinued the psychotropic medication . . . Seroquel, without giving [the plaintiff] anything to counteract the effect of withdrawal from the medication").

For these reasons, San Miguel's claim that Defendant Keesee was deliberately indifferent to his serious medical needs regarding his withdrawal symptoms should be dismissed.

---

on that level of notice. *See Whitlock v. Stephens*, No. 5:14cv94, 2016 WL 11474208, at *5, *10 (E.D. Tex. Oct. 5, 2016) (stating that prisoner "cannot use the grievance process to impute personal liability," where prisoner merely alleged that the defendants investigated and signed prisoner's grievance), *R. & R. adopted by* 2016 WL 7155292 (E.D. Tex. Dec. 8, 2016); *Lueck v. Wathen*, 262 F. Supp. 2d 690, 696 (N.D. Tex. 2003) (explaining that prisoner's claim against assistant warden, who served on prison grievance committee and allegedly wrongfully denied prisoner's grievance, failed to state a claim where prisoner did not allege warden was personally involved in any constitutional violation, as "[p]ersonal involvement is an essential element in a civil rights action").

**4. Claim nine of San Miguel's Amended Complaint, alleging retaliation by Defendant Keesee, fails because his allegations only nominally reference Keesee and assert no facts demonstrating a constitutional violation.**

In claim nine of his Amended Complaint, San Miguel alleges that Defendant Keesee stopped his psychiatric medications in retaliation for a grievance he filed against another TCCC medical provider, Courtney Bearden, a Defendant previously dismissed in this case. Am. Compl. 21. San Miguel's allegations fall short because he does not plead facts supporting three of the four required elements to establish a retaliation claim against Defendant Keesee.

In his Amended Complaint, San Miguel provides sparse factual allegations regarding his retaliation claim against Defendant Keesee. Instead, he appears to restate his previously dismissed claim of retaliation against Defendant Bearden, and merely alleges that he spoke with Defendant Keesee about the perceived retaliation. *Id.* at 14–15 ("As the result of Plaintiff telling Bearden about him writing a grievance against her, she completely stopped all of Plaintiffs [sic] Psychiatric Medication."). He acknowledges that he spoke with Defendant Keesee on January 8, 2020, at which time she tried to "convince [San Miguel] that Bearden did not stop his medication because he wrote a [grievance] on" Defendant Bearden. *Id.* at 16. The only actions regarding his retaliation claim that San Miguel attributes to Defendant Keesee are her (1) informing San Miguel that Defendant Bearden had ceased his medication, and (2) failing to answer "multiple sick call request[s] for help." *Id.* at 16–17.

A plaintiff must show the following to establish a retaliation claim: "(1) the existence of a specific constitutional right; (2) the defendant's intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation." *Freeman v. Tex. Dep't of Crim. Just.*, 369 F.3d 854, 863 (5th Cir. 2004) (citing *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995)). Conclusory allegations, including a plaintiff's personal belief that he is the victim of retaliation, are insufficient

to support a claim for retaliation. *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999). Instead, "'[t]he [plaintiff] must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.'" *Haddix v. Kerss*, 203 F. App'x 551, 554 (5th Cir. 2006) (quoting *Woods*, 60 F.3d at 1166); *see also Brown*, 911 F.3d at 245 (applying *Woods* to an SVP's retaliation claim).

Here, Sam Miguel fails to state a viable retaliation claim. Other than making the conclusory assertion that he believes Defendant Keesee's actions were retaliatory, San Miguel pleads no facts demonstrating Defendant Keesee's intent to retaliate for the exercise of a constitutional right, a retaliatory adverse act, or causation. While the Court notes that the filing of a grievance can be a constitutionally protected activity (*Gonzales v. Gross*, 779 F. App'x 227, 230 (5th Cir. 2019) (per curiam)), San Miguel has not alleged that Defendant Keesee retaliated against him for filing a grievance against Defendant Bearden; rather, he alleges that Defendant *Bearden* retaliated against him—a claim the Court has previously dismissed—and Defendant Keesee merely informed him of Bearden's actions. Am. Compl. 16–17.[20] As such, San Miguel does not plead a retaliatory adverse act: he identifies no facts causing him to believe that Defendant Keesee personally retaliated against him for the exercise of his right to file a grievance.[21] *See id.* Similarly,

---

[20] San Miguel includes a conclusory line on one page of his Amended Complaint alleging that on May 3, 2019, Defendant Keesee denied him medication for a headache because he had previously submitted a grievance against her. Am. Compl. 12. San Miguel does not provide any facts forming the basis of this allegation, such as the date on which he filed his grievance or why he claims she denied him headache medication as a result. Because San Miguel also does not mention this allegation in relation to his explanation of claim nine, the Court analyzes only the facts San Miguel appears to plead in relation to claim nine. *Id.* at 21 ("Defendant Keesee has retaliated against San Miguel for exercising his right to petition the government for redress of grievance," by "completely stopping any and all psychiatric medications . . . after he told Defendant Bearden that he wrote a grievance against her with the Texas Board of Nursing." (cleaned up)).

[21] San Miguel pleads that "Defendant Keesee did not concern herself with answering the multiple sick call request[s] for help" he sent after December 30, 2019. Am. Compl. 17. The medical records he attaches to his Amended Complaint refute this claim. "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995). San Miguel requested to be removed from Defendant Bearden's caseload on December 20, 2019, which she warned would cause some delays in his medical treatment because she was the only mental health provider at the facility. Am. Compl. 26. San Miguel attaches two sick call requests, dated January 1 and January 6, 2020, complaining of

San Miguel alleges no facts establishing Defendant Keesee's intent to retaliate against him for a grievance filed against someone else. Without retaliatory intent or an adverse act, San Miguel also cannot present a timeline of facts from which the Court may draw an inference of causation. *Hines v. Graham*, 320 F. Supp. 2d 511, 521 (N.D. Tex. 2004) (finding prisoner failed to state a claim where, even after the court provided him an "opportunity to expound on his retaliation claims, [prisoner] offer[ed] only his own conclusory opinion that the Defendants had a retaliatory motive"); *Oliver v. Roquet*, 858 F.3d 180, 195 (3d Cir. 2017) (affirming dismissal of civilly committed sex offender's retaliation claim where he did not "sufficiently allege[] any direct 'causal link' between [his therapist's actions] and his First Amendment protected activities").

Because San Miguel has merely attached the "retaliation" label to actions performed by someone other than Defendant Keesee, without adequate factual support, the Court recommends dismissal of San Miguel's retaliation claim against Defendant Keesee. *See, e.g.*, *McCoy v. Berrera*, No. 7:18-CV-00061-M-BP, 2020 WL 2025641, at *5 (N.D. Tex. Mar. 31, 2020) (concluding 12(b)(6) motion should be granted, where retaliation claim was "simply too conclusory and unsupported by factual allegations to support a plausible claim for relief"), *R. & R. adopted by* 2020 WL 1986460 (N.D. Tex. Apr. 27, 2020); *Coronado v. Lennox*, No. 5:12-CV-00044-BG, 2012 WL 7005384, at *2, *5 (N.D. Tex. Oct. 15, 2012) (recommending dismissal at screening of prisoner's retaliation claim premised on nothing more than prisoner's personal belief that he was victim of retaliation), *R. & R. adopted by* 2013 WL 440149 (N.D. Tex. Feb. 5, 2013); *Dotie v. Jones*, No. 2:10–CV–0128, 2010 WL 2668379, at *2 (N.D. Tex. June 16, 2010)

---

sleeplessness and emotional distress. *Id.* at 28–29. In response to the first request, the receiving nurse set San Miguel an appointment with Defendant Keesee on January 8, 2020, which he attended before "becoming aggressive and belligerent," and being "asked to remove self from medical." *Id.* at 28.    When San Miguel sent two more requests on January 10 and January 21, 2020, Defendant Keesee noted that she forwarded his request to the mental health provider who would be providing his future treatment. *Id.* at 36–37.

(recommending dismissal of prisoner's retaliation claim because his conclusory allegations failed to satisfy the causation and retaliatory motive elements of his claim), *R. & R. adopted by* 2010 WL 2667680 (N.D. Tex. July 1, 2010).

**D. San Miguel's official capacity claims for injunctive relief fail because he has not alleged sufficient facts showing a viable underlying claim. As to claim seven, the district judge should dismiss San Miguel's claim for injunctive relief because his conclusory allegation that he is at risk of irreparable harm is insufficient for such extraordinary relief.**

San Miguel seeks a "PERMANENT INJUNCTION" requiring Defendants to provide the food, medicine, and treatment that he alleges Defendants have unconstitutionally denied him, "[t]o ensure in every way his treatment and conditions of confinement are more considerate, than the conditions of confinement are for criminals," and to prevent Defendant Keesee from having authority to deny his prescriptions. Am. Compl. 21–22.

Unlike claims for monetary relief, qualified immunity does not protect government officials from injunctive relief. *Orellana v. Kyle*, 65 F.3d 29, 33 (5th Cir. 1995). "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "If . . . a less drastic remedy . . . [is] sufficient to redress [plaintiff's] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted" (*id.* at 165–66) because it "should only issue when essential." *Google, Inc. v. Hood*, 822 F.3d 212, 221 (5th Cir. 2016). To obtain a permanent injunction, a plaintiff must plead and prove "(1) the existence of a substantial threat of irreparable harm that outweighs any harm the relief would accord to the defendants, (2) that there is no adequate remedy at law, and (3) that granting the injunction will not disserve the public interest." *Millennium Rests. Grp., Inc. v. City of Dallas*, 191 F. Supp. 2d 802, 809 (N.D. Tex. 2002). And rather than simply proving a substantial *likelihood* of success on the merits, as with a preliminary injunction, to obtain

"a permanent injunction . . . the plaintiff must demonstrate *actual* success on the merits." *Id.* (emphasis added). As demonstrated above, San Miguel has failed to plead sufficient facts showing that Defendants engaged in conduct that violated the Constitution with respect to each of his claims. The undersigned accordingly recommends that the district judge dismiss San Miguel's claims for permanent injunctive relief against Defendants McLane, Kingston, Salinas, Castro, and Keesee for want of a constitutional violation. *See Johnson v. CitiMortgage, Inc.*, No. 3:14–CV–1794–M–BH, 2015 WL 269970, at *5 (N.D. Tex. Jan. 21, 2015) (denying claim for injunctive relief where breach of contract claim was subject to dismissal on the merits).

Moreover, San Miguel's psychiatric medication claims relate to a discrete two-week period where Defendants allegedly delayed treating his withdrawal symptoms. Because this is a single incident, he is not entitled to a permanent injunction. *See Deal v. Dep't of Corr.*, No. 15-00534-BAJ-EWD, 2017 WL 6566198, at *6 (M.D. La. Dec. 22, 2017) (granting summary judgment against plaintiff because his excessive force claim "center[ed] around a single incident" and permanent injunction was therefore unwarranted). Moreover, San Miguel's past injuries, if proven, are capable of being remedied by law. *See Miller v. Harrison Cnty.*, No. 1:07cv541-LG-JMR, 2008 WL 11435639, at *8 (S.D. Miss. Nov. 20, 2008) (granting motion for summary judgment and denying injunction because any harm inmate suffered by defendants' alleged denial of medical care could be remedied by damages).

Accordingly, the magistrate judge recommends dismissal of San Miguel's request for injunctive relief against the remaining Defendants in their individual and official capacities.

## V.    Conclusion

For these reasons, the undersigned recommends that the United States District Judge **GRANT** Defendants Marsha McLane, Michael Searcy, Rachael Kingston, Chris Salinas, Joanne

Castro, and Debra Keesee's Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) (ECF No. 62) and **DISMISS WITHOUT PREJUDICE** for lack of subject matter jurisdiction Plaintiff Samuel San Miguel's claims for monetary relief against Defendants Kingston, Salinas, Castro, and Keesee in their official capacity; **DISMISS WITH PREJUDICE** for failure to state a claim San Miguel's claims for injunctive relief against all remaining Defendants in their official capacities; **DISMISS WITH PREJUDICE** for failure to state a claim San Miguel's claims against all remaining Defendants in their individual capacities; and **DISMISS WITH PREJUDICE** for failure to state a claim San Miguel's request for declaratory relief.

## VI.    Right to Object

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2017); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: February _18_, 2022.

**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**